Good morning. May it please the Court, my name is Chris Kirkring, and along with Nancy Tenney, we represent Suzette Bland. I'd like to focus my arguments this morning on the evidentiary issues in this case, in particular, the trial court's decision to admit three statements made by Gabrielle Smith, Ms. Bland's mother. One of those statements was made to an undercover agent during the course of the investigation. The second statement is a 2004 at-a-client's calendar. And the third statement is was made to a Social Security agent after Ms. Bland had been arrested. The government admitted or the government argued that these statements should be admitted as part as statements of a co-conspirator. And the trial court accepted that argument. And it is our – it is our contention that that was error. In order for a conspiracy – a co-conspirator statement to be admitted, the government has to show by preponderance of the evidence that a conspiracy existed, that both Ms. Smith and Ms. Bland had knowledge of and participated in the conspiracy, and that the statements were made in furtherance of that conspiracy. And the government cannot rely on the statements themselves as evidence of the conspiracy. They must show independent evidence that that conspiracy existed. And that is precisely where we run into a problem here. And I'd like to focus on the issue of knowledge in particular. In order for the government to show that Gabrielle Smith was involved in this conspiracy, it had to show that Ms. Smith not only knew that her daughter collected Social Security, but that she knew that her daughter's Social Security payments, and that she knew that her daughter's was concealing those activities from the Social Security Administration. Let me ask this. Is it in – is it in furtherance of the conspiracy if you helped to conceal it after the fact? There are some cases that say that concealing after the fact is in furtherance of the conspiracy. That cannot be the case here, though, because when you look at the knowledge component of the conspiracy – of conspiracy, you would have to show that Ms. Smith knew of the conspiracy prior to the arrest and prior to her statements to the agent. And that is the critical flaw in this case. When you look at the evidence that even comes close to suggesting a conspiracy, it is all evidence that suggests knowledge. It is all evidence that occurred after Ms. Smith was called by the Social Security agent and told that her daughter was under arrest for Social Security fraud, after she had spoken to her daughter, and after – who had just immediately been arrested, and after she had been told that her salon had been searched. That is how she obtained the knowledge of the – of this alleged illegal activity. There is no evidence that she knew of any attempt to defraud Social Security prior to that. So the statement she makes after this cannot be used to impute knowledge before. And that is where – that is where the trial court erred in assuming that – that knowledge existed throughout this case. And it – that comes through, I think, in part in the way the trial court analyzed this issue. And as we mentioned in our brief, the trial court looked at the evidence as if-believed. It – it essentially adopted the government's theory of – of this case and – and said, well, if that theory is true, then a conspiracy existed. And that is not the standard that the trial court needs to adopt in order to analyze what the co-conspirator's statements. It must show by a preponderance of the evidence that a conspiracy existed. And that – that showing was not met here. Is there any evidence to show that Ms. Smith was unavailable? There's one statement. I believe it's one statement, that she had – that she had asserted her Fifth Amendment rights. However, she did not come on the record and go before the Court and assert her Fifth Amendment rights. And that – that's – that's an additional problem. We – we've been wondering, why – why not call Ms. Smith? Why not have – why not – if you need her, why not grant her immunity? And, frankly, that's – that's a question I can't answer. But – but I do think that it is an issue that we – that we've been wondering about ourselves. And – and that actually – the fact that she wasn't called leads to a second issue, which is the Crawford issue. And the Crawford issue really only applies to the statements made after the arrest to the agent. But those statements were testimonial statements. And because Ms. Smith was not made available, that is constitutional error and needs to be addressed as such. The – the reason this is important is because when you look at the evidence in this case, the evidence – the heart of the government's case is that not only that Ms. Bland worked at the salon, but that she was paid for that work. And that is consistent from the opening arguments throughout the case and to the closing arguments. But, in fact, under Count II, she could have been convicted, even if she were not paid, for failing to reveal that she was working. I – I actually disagree. And – and the reason is, if you look at that statement, the – the – the statement that she adopted is cut out in isolation. If you look at – if you look at the documents that were – that – where she was asked questions and she answered those questions, they all associate work with income, every single one of them. And if you look at the two – the two sentences of the statement she adopted, the first one says I don't – I didn't work. The second one says I didn't work and receive income. And that is exactly the connection that was made in every document that was – was presented to the jury. Income and work were tied together. And that goes to – without this – without this evidence of receiving payments, there is – there's – there's a very legitimate question and a legitimate concern about whether Ms. – Ms. Bland knew that she had to report unpaid activities. She was never asked about volunteer work. She was never asked about unpaid activities. And as a result, if these – since – since this evidence of payment was erroneously admitted, it does lead to serious questions as to the validity of the jury's verdict. Now, the appointment book was qualified as a business record by the testimony of the agent who saw an appointment written into the book. Now, is that sufficient for qualifying? Absolutely not. And what we – as we address in our – in our briefs, the – in order for a business record to be authenticated, it has to be authenticated by someone with knowledge. And when you look, the – the Dakota case from the Sixth Circuit deals directly with this, and it says an arresting agent is not qualified. The only other evidence that they have to qualify this book is one agent walked in and saw a similar book where an appointment was written in, not even the same book that was admitted into evidence, but a similar one. And that is the scope of their – of their authentication. And that simply is not sufficient. That's clear in the Dakota case and in the Latin case from the Ninth Circuit as well. And if the – if there are no more questions, I'd like to reserve the rest of my time for rebuttal. Thank you. Good morning, Your Honors. I'm Catherine Worma, Assistant United States Attorney representing the government in this case. Did you try the case? Yes, I did, in conjunction with my co-counsel. Your Honors, I would like to direct my comments this morning to the reasons why, if there was an error with respect to the admission of this evidence, it was absolutely harmless error. The reason for that is this, begins with this. Ms. Bland was receiving supplemental security income disability benefits. Eligibility for those benefits are dependent upon two factors. One of them is medical disability preventing a person from the ability to perform work activity. The other factor is income and resources. The income and resources factor did come up in this case. It was not the heart and soul of this case. The heart and soul of this case was the evidence, which was exhaustive, presented by eight separate witnesses with respect to her work activity. I would like to emphasize for the Court in that regard what kind of representations the claimant made with respect to her condition preventing her from performing work activity. And those are reflected in the supplemental excerpt of record, the various applications that she filed. What she stated repeatedly in those applications was she had an anxiety disorder. She had anxiety attacks. She had depression. She had back and neck pain. She vomited relentlessly. She could not deal with people. She stated that over and over. Except for the last one, all of those others are pretty subjective and certainly not anything that could be considered perjurious or ---- I'm not suggesting that, Your Honor. I'm suggesting that the evidence that the government developed and presented during the case went to show what she was doing in that salon beginning as early as 1999 or 1998, that she was there consistently, regularly, that she was working with customers, that she was doing all of the kinds of things that she had represented where she could not do as the basis for her disability. And in that regard, I would note, for example, and first to emphasize that the very first witness presented by the government, Greg Pilgrim, from the Social Security Administration, explained at length what the requirements were for this program, that they are medical and financial, the repeated notices that this claimant received that she had to report to Social Security if either of those conditions changed, if there was any change in her medical condition that might allow her to go to work. And, in fact, Mr. Pilgrim was asked specifically, what if the person isn't even getting paid for work? Is that something they still have to report? We would still need to know that information. And that's in the area of 221 of the excerpt of record. Sotomayor, is that something that the recipients have clear notice of? Absolutely, Your Honor. And the language notifying them of that is reflected in all these various documents that she signed in the supplemental excerpt of record at 1, at 5, at 12, at 18, at 26. Mr. Pilgrim also testified with respect to that repeatedly, all the various notifications that this claimant received as part of the process. In addition, Your Honor, specifically Well, would you read one of those information items to us where she would know that if she worked and didn't get paid, that she needed to report it? If Your Honor will allow me a moment, I certainly will. Okay. And this is in the course of Mr. Pilgrim's testimony. He's reading from a pamphlet that she was provided. Page 18, and this is an excerpt of record 199. At the top of the page where it says, if you get better, it says, if you get SSI because of a disability or blindness, you must tell us if your condition improves. And she is informed of that repeatedly. She also, during the course of her receipt of Has anybody been prosecuted for failure to report that they feel better? Well, I don't know. I don't believe so, Your Honor. And they wouldn't be. The fact of the matter is, it wasn't just she was feeling better. She was working. And she was What we want to know is, what's the notice that working without pay is something that has to be reported? Well, I think the notice, repeatedly, is if your condition improves, you must report that. She had represented she could do no work activity. She could not, particularly, she could not be around people. And we have evidence, as I said, and this is what was the heart of this case, eight witnesses testifying with respect to her activities in that salon over the course of, sorry, beginning as early as 1999. Everyone from the mail carrier who saw her almost five days a week in there working, the manager of the property who saw her there repeatedly, who testified that not only did she see her in the salon working, she would frequently come into the property office and pay the rent. She would come in and ask for a key on days when she had shown up and had forgotten her key. She would come into the office to complain about things being problems in the space, the hot water wasn't working. Counsel, I guess you have to address whether these other items that were admitted were hearsay, and if they were hearsay and inadmissible, whether they had a substantial effect on the verdict. Well, again, Your Honor, I would like to address, I think, the latter point first. In terms of their effect on the verdict, I would say very little, if at any, and, again, that they were unnecessary. And I would point in that regard to the fact that if that's true, why did the government offer that evidence? It was additional evidence that showed her guilt. But I would refer the Court to the closing argument of the government, in which the calendar book was never mentioned once, the closing argument. The statement of the mother to the agent, which is another statement at issue here, never mentioned in the government's closing argument once. In the defense closing, the defense counsel brings up the calendar book and mentions it several times. And he suggests that work equates to getting paid. It's the defense counsel who is making that suggestion. In rebuttal, the government counsel then says, well, if you're looking for evidence that she got paid, it's in the calendar book. And that was the reference that has been characterized as being the heart and soul of the government's case surrounding this calendar book. It was not. The heart and soul of this case was the testimony from eight different witnesses that she was engaged in activity that was absolutely inconsistent with the representation she had made in order to qualify for SSI disability benefits. The instructions to the jury make it clear that it is in any condition that she's disguising, that she's intentionally disguising in order to get more benefits, and that she is failing to disclose. It is not necessarily the economic aspect. Did you present any evidence to the Court that Ms. Smith was unavailable? No, we did not, Your Honor. And do Your Honors have any further questions? No, thank you. Thank you. A couple points, Your Honors. First, when the government says, oh, well, she was feeling better, I think that that is something that is, as you suggested, subjective. And instead of taking the government's word for it, I think it's important to first look at what the administrative law judge concluded about Ms. Bland. It was not that she was – the key issue was her mental health, not her physical health. And if you look at the supplemental excerpts of record at 27 and 28, what the ALJ describes as a person who does not have transferable skills to perform other work within her physical and mental residual functional capacity, and that, based on that, that this person is not – is – that qualifies for supplemental security income. Now, you turn to Ms. Bland working in her mom's salon, this salon that her mom has owned for decades that is like a second home, where her mental and physical problems can be accommodated by someone who loves her and who will be willing to oversee her, to allow her to leave if she needs to leave, will be able to provide for her, will be able to deal with these issues. That is not something that means that these skills or this – these efforts are transferable anywhere else. And so suddenly to say because she could function in this environment that was like a second home means nothing about whether she could actually go out and get a job and show up on time and be able to – to suffer through her anxiety attacks and – and still maintain that – that work. Second … Kennedy. So are you saying that working for her mother was therapeutic or part of her therapy? You know, I think that that is actually not a bad way to characterize it. When you look at the evidence, she consistently says in her statements, I want to get back to work. I want to try working. And that is – this is a way for her to be able to confront these anxieties, deal with them in a manner that – that she has – that has the forgiveness for these disabilities. But if she could work, would not any employer be required under the ADA to give her accommodations? Only within limit – only within limitations. If she cannot show up regularly for work because of her illness, if she has to leave because of anxiety attacks, these are things that any employer would take concern with. And that is precisely why we have supplemental security income. Now, the – the other thing that – that – and this really does focus on the mental – the mental health aspect. If you look at the closing argument at page 589, they do refer to health improving, but it's physical health. And finally, what – what Officer Pilgrim, or Agent Pilgrim, said was important to him was simply not communicated to Ms. Bland. If you look closely, and in our response, we do address each of those pieces of evidence. They all link work activity with payment. And there's nothing to say that volunteer work or other activities, in fact, are things you need to disclose. And in addition, Ms. Bland did disclose volunteer work. It did not affect her – her Social Security income, and there's no evidence this would have either. Well, as her mother made notations that – that, what, it was a glance at a weekbook or sums of money, and that was for buying groceries, well, why would she do something like that? Why – why would the mother keep track of the grocery money? Well, you know, that's assuming that, in fact, she was keeping track of the grocery money. This may be – there – what you have to do is you have to rely on the truth of that statement to suggest that that's what those references mean. And if she was keeping track of grocery money, here's a mom who's concerned about her daughter's mental health and her grandson. Maybe she's keeping track of grocery money. Maybe she's keeping track of money that she is actually putting into an account for her daughter that her daughter doesn't know about in case she runs into trouble. We don't know. And the only person who does know wasn't called to testify. All right. Thank you. Thank you. All right. Thank you.
judges: B. Fletcher, Pregerson, Selna